# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | Case No. 09-02025-TLM |
| RANDY WOODMAN and, | ) | |
| RACHEL LAWRENCE | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| JAMES MURRAY and | ) | |
| DEBRA MURRAY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. No. 09-06052-TLM |
| v. | ) | |
| | ) | |
| RANDY WOODMAN and | ) | |
| RACHEL LAWRENCE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| BOISE ISLAND PARK, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. No. 09-06053-TLM |
| v. | ) | |
| | ) | |
| RANDY WOODMAN and | ) | |
| RACHEL LAWRENCE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

MEMORANDUM OF DECISION - 1

## MEMORANDUM OF DECISION
_____

Before the Court are two adversary proceedings filed by Jim and Debra Murray and Boise Island Park, LLC against joint chapter 7 debtors Randy Woodman and Rachel Lawrence ("Debtors") seeking to except from Debtors' discharge certain alleged debts under §§ 523(a)(2), (a)(4), and (a)(6).[1]  The adversary proceedings were tried in a consolidated fashion and then taken under advisement.  This Memorandum of Decision disposes of the matters and constitutes the Court's findings of fact and conclusions of law under Rule 7052.

**FACTS**

    **A.**    **Idaho Real Estate Recyclers, LLC**

Debtors are married, but were separated at the time of trial.  In March 2004, they organized Revolution 1.5, a limited liability company.  Debtors each owned a 50% membership interest in the company.  Shortly thereafter, they organized a second limited liability company, Idaho Real Estate Recyclers, LLC ("Recyclers"), with Revolution 1.5 as its sole member.  Later, In Flow, LLC ("In Flow"), a one-member limited liability company owned by Stacy McBain, Woodman's business partner, was also added as a member of Recyclers.

_____

[1] Unless otherwise indicated, all chapter, section, and other statutory references in this Decision are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Code"), and all rule references are to the Federal Rules of Bankruptcy Procedure 1001–9037.

Revolution 1.5 owned a 52.5% membership interest in Recyclers while In Flow held a 47.5% interest.  Revolution 1.5 was the managing member.

Recylcers was created as a vehicle for purchasing and selling real estate. Debtors and McBain would organize an LLC, with Recyclers as a member, for the purpose of purchasing and holding an identified parcel of real property.  They then solicited potential "investors" who, in exchange for their investment, received membership interests in the LLC, and the LLC would then purchase and hold the property.  Investors hoped to receive a return in the form of a rental income stream or, in the case of a subsequent sale, proceeds from equity created by appreciation or improvements made to the property, either return being based on the proportion of their respective membership interests in the LLC.

### B.    Lawrence & Associates, LLC

In addition to its interest in Recyclers, Revolution 1.5 also owned a 55% membership interest in Lawrence & Associates, LLC, a property management company Debtors organized in April 2005.  Lawrence & Associates managed residential and commercial real properties, entering into leases, collecting rents, and arranging for or otherwise providing maintenance for the owners of those properties.  McBain, through a wholly owned limited liability company named Stacy McBain, LLC, owned the other 45% interest in Lawrence & Associates.

MEMORANDUM OF DECISION - 3

C.     The Murrays and Tubac, LLC

Some time in late 2007 or early 2008, Carla Gardner, an employee of

Recyclers, circulated a proposal via e-mail regarding a potential investment

property located in Tubac, Arizona.  The proposal included a general description

of the property (a townhouse), the estimated costs associated with the investment,

and an estimated return.  Jim and Debra Murray, who had previously invested in

another property with Recyclers,[2] were among the e-mail recipients.  The Murrays

expressed interest and eventually invested in the project, sending a $42,600 check

in March 2008.  In return Mr. Murray received a 49% membership interest in

Tubac, LLC ("Tubac"), the entity that had been created to purchase and hold the

Tubac property.  Recyclers held the other 51% membership interest in Tubac.

The funds contributed by the Murrays were placed in a separate bank

account established for Tubac.  Other than the Murrays' $42,600, no other

deposits were made into the Tubac account.  On the day the funds were deposited,

March 11, 2008, two checks were drawn on the account — one for $5,000, and a

second for $7,083.  According to Debtors, the $5,000 was used as a down payment

on the Tubac property, and the $7,083 was drawn as compensation for services

provided by Recyclers.

---

[2]  This other investment property was eventually foreclosed on and produced no return to
the Murrays.

MEMORANDUM OF DECISION - 4

Negotiations for purchase of the property ensued. At least one offer was made on the Tubac property in May 2008, but Debtors, individually or through their business entities, were unable to secure adequate financing to consummate a sale.

Meanwhile, unbeknownst to the Murrays, Debtors transferred funds from the Tubac account to Lawrence & Associates' general business account, from which they then paid various expenses for several closely-held businesses in which they held ownership interests, albeit indirectly through their LLC entities. Between March 19 and April 22, 2008, Debtors transferred $29,800 from the Tubac account, leaving a balance of only $717.

After attempts to purchase the Tubac property proved unsuccessful, the Murrays were approached about loaning the money they had contributed to Tubac to other Debtor-related entities, including Lawrence & Associates, as an alternative investment. The Murrays declined the offer and requested a refund of their investment. Both Debtor Rachel Lawrence and Carla Gardner, acting as an employee of Recyclers and at the direction of Debtor Randy Woodman, assured the Murrays that they would be refunded their capital contribution in Tubac. Despite these representations, the Murrays never received a refund.

### D.    Boise Island Park, LLC

In September 2007, Lawrence & Associates entered into a property

MEMORANDUM OF DECISION - 5

management contract with Boise Island Park, LLC ("Boise Island") to manage Riviera Estates, a mobile home park in Eagle, Idaho owned by Boise Island. Ex. 105 ("Agreement"). Under the Agreement, Lawrence & Associates agreed to execute rental agreements and collect rents, security deposits, and other receipts on behalf of Boise Island. The Agreement further provided that Lawrence & Associates would pay expenses associated with the property (excluding mortgage payments, taxes and insurance) and provide Boise Island a monthly statement of bills paid. After deducting the expenses paid and a management fee equal to 5% of the gross monthly rent receipts, Lawrence & Associates was required, on a monthly basis, to remit to Boise Island the remaining net funds. *Id.* Zachary Gingg, a principal of Boise Island, testified that generally he received a check and statement from Lawrence & Associates around the 15th of each month.

In August 2008, Boise Island did not receive a check for the July rents and security deposits or a statement of expenses paid. Gingg contacted Lawrence & Associates and was assured that the July rents would be forthcoming. Gingg never received the July rents and at the end of August he was informed that Lawrence & Associates was ceasing operations. In addition to the July rents, Boise Island never received the rents and deposits collected by Lawrence & Associates for the month of August. According to the evidence presented at trial,

MEMORANDUM OF DECISION - 6

the gross amount collected for July and August totaled $38,025.[3]

### E.  Bankruptcy filings

Lawrence & Associates ceased operating the end of August 2008, and filed a chapter 7 bankruptcy on November 21, 2008.  Debtors later filed their joint petition for chapter 7 relief on July 13, 2009.  The Murrays and Boise Island, through this proceeding, seek to have the debts allegedly owed them by Debtors declared nondischargeable under § 523(a)(2), (a)(4), or (a)(6).[4]

## DISCUSSION AND DISPOSITION

### A.  Section 523(a)(2)(A)[5]

Section 523(a)(2)(A) excepts from an individual debtor's discharge any debt for money, property, services or credit, to the extent obtained by false pretenses, a false representation, or actual fraud.  *See*, *e.g.*, *Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010).  A creditor asserting a claim

---

[3]  This evidence consisted of the testimony and ledgers of Audrey Gilbert.  *See* Ex. 106 (ledgers).  Gilbert is a resident of Riviera Estates who collected rents and deposits from her fellow tenants and delivered those funds to Lawrence & Associates.

[4]  Murray's complaint includes allegations of securities fraud under the Idaho Uniform Securities Act (2004), Idaho Code §§ 30-14-101 to -703.  While asserting violations of the Idaho securities laws, Murray did not plead a cause of action under § 523(a)(19) which excepts from discharge a debt for "the violation of any of the Federal securities laws . . . any of the State securities laws, or any regulation or order issued under such Federal or State securities laws."  Nor was such a claim tried by the consent of the parties.  *See* Fed. R. Civ. P. 15(b)(2), incorporated by Fed. R. Bankr. P. 7015.  Accordingly, the Court does not address § 523(a)(19).

[5]  Murray and Boise Island pleaded causes of action under § 523(a)(2) generally.  However, no evidence of false written statements was presented at trial.  The Court therefore does not address § 523(a)(2)(B) and treats the claims solely as arising under § 523(a)(2)(A).

MEMORANDUM OF DECISION - 7

under § 523(a)(2)(A) bears the burden of proving, by a preponderance of the evidence, five elements: (1) the debtor made representations; (2) that at the time he knew were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made. *Id.* (citing *Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir. 1996)).

Neither Murray nor Boise Island have shown that Debtors made representations that at the time Debtors knew were false and that were intended to deceive. Murray points to the assurances he received from Lawrence and Gardner, at the direction of Woodman, that his contribution to Tubac would be refunded as false representations supporting a § 523(a)(2)(A) claim. Similarly, Boise Island contends that the assurances Gingg was given that he would receive payment for the July rent and deposit receipts constitute false representations for purposes of § 523(a)(2)(A).

A promise made without a present intent to perform satisfies § 523(a)(2)(A), as does a representation which the debtor knew or should have known was outside of the debtor's prospective ability to perform. *McCrary v. Barrack (In re Barrack)*, 217 B.R. 598, 606 (9th Cir. BAP 1998); *Wells Fargo Bank, N.A. v. Covino (In re Covino)*, 04.3 I.B.C.R. 98, 104 (Bankr. D. Idaho 2004)

MEMORANDUM OF DECISION - 8

(quoting *Bell v. Smith (In re Smith)*, 232 B.R. 461, 466 (Bankr. D. Idaho 1998)).

However, there was no evidence that Debtors did not, in fact, intend to pay

Murray or Boise Island when they promised them payment. To the contrary,

Debtors' testimony was that their intent was to pay Murray and Boise Island with

money they expected to receive from either the sale of other investment properties

or Lawrence & Associates' accounts receivable. Nor did Plaintiffs present any

evidence to show Debtors knew or should have known they lacked the prospective

ability to perform on their promises.

Because Plaintiffs have not demonstrated that Debtors' intended to deceive

them with their representations of future payment, their causes of action under

§ 523(a)(2)(A) will be dismissed.

### B.    Section 523(a)(4)

Section 523(a)(4) excepts from discharge debts that arise from "fraud or

defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

Plaintiffs do not claim Debtors committed larceny,[6] but do contend the alleged

debts at issue in this proceeding arose from Debtors' fraud or defalcation while

---

[6] In any event, the evidence demonstrates Debtors came into possession of the funds at issue (*i.e.*, the $42,600 contribution from the Murrays and the July and August rent receipts for Riviera Estates) lawfully. To sustain a cause of action for larceny under § 523(a)(4) an objecting creditor must show that the initial possession of the property was wrongful. *Ormsby v. First Am. Title Co. (In re Ormsby)*, 591 F.3d 1199, 1205 (9th Cir. 2010); *see also* 4 Collier on Bankruptcy ¶ 532.10[2] (Alan R. Resnick & Henry J. Sommer eds., 16th ed. 2010) ("As distinguished from embezzlement, [with larceny] the original taking of the property must be unlawful.").

MEMORANDUM OF DECISION - 9

acting in a fiduciary capacity or, in the alternative, from Debtors' embezzlement of funds.

### 1.    Fraud or defalcation while acting in a fiduciary capacity

To prevail on a cause of action under § 523(a)(4) Plaintiffs must not only show Debtors' fraud or defalcation, but also that Debtors were acting in a fiduciary capacity when they committed the fraud or defalcation. *See Teichman v. Teichman (In re Teichman)*, 774 F.2d 1395, 1398 (9th Cir. 1985).

The definition of "fiduciary capacity" under § 523(a)(4) is a narrow one and is governed by federal law:

> The broad, general definition of fiduciary — a relationship involving confidence, trust and good faith — is inapplicable in the dischargeability context. . . .  The fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt.

*Cal-Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1125 (9th Cir. 2003) (internal citations omitted).  These requirements exclude constructive, resulting or implied trusts.  *See Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986) (citing *Runnion v. Pedrazzini (In re Pedrazzini)*, 644 F.2d 756, 759 (9th Cir. 1981)).[7]

Additionally, while the meaning of "fiduciary capacity" is a question of federal law, state law is to be consulted to ascertain whether the requisite fiduciary

---

[7]  This narrow definition of "fiduciary" is consistent with the underlying policy of construing § 523 exceptions to discharge strictly against the objecting creditor and liberally in favor of the debtor.  *See Honkanen v. Hopper (In re Honkanen)*, __ B.R. __, 2011 WL 781831, at *2 n.5 (9th Cir. BAP Feb. 16, 2011)

MEMORANDUM OF DECISION - 10

relationship exists. *Cantrell*, 329 F.3d at 1125 (9th Cir. 2003) (citing *Lewis v.*

*Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996)).

> **a.    Debtors were not acting in a fiduciary capacity with respect to Murray**

The Murrays do not claim that an express trust existed between them and

Debtors.  Rather, they contend that under Idaho law members of an LLC are

trustees with respect to LLC assets.  Therefore, they argue, Debtors, as the

individuals controlling Recyclers, were acting in a fiduciary capacity with respect

to Murray — the only other member of Tubac — when they transferred the funds

out of the Tubac account.

To examine the nature of the relationship between LLC members the Court

first looks to the applicable statutory framework.  Section 53-622 of the Idaho

Limited Liability Company Act, Idaho Code §§ 53-601 to -672 (2009) (the

"Act"),[8] provides:

> Every member and manager must account *to the limited liability company* and *hold as trustee for it* any profit or benefit derived by that person without the consent of more than one-half (½) by number of the

---

[8]  In 2008, the Idaho legislature enacted comprehensive amendments to the statutory scheme governing limited liability companies through the Idaho Uniform Limited Liability Company Act, Idaho Code §§ 30-6-101 to -1104.  2008 S.L. ch. 176 §§ 1, p. 480.  In conjunction with these amendments the legislature repealed the Idaho Limited Liability Company Act, effective July 1, 2010.  2008 S.L. ch. 176 §§ 5, 6, p. 522.  Until July 1, 2010, the original act governed all limited liability companies formed prior to July 1, 2008 that did not elect to be subject to the new act.  Idaho Code § 30-6-1104.  Tubac LLC was formed prior to July 1, 2008, there is no evidence that it ever elected to be subject to the new act, and this litigation commenced prior to July 1, 2010.  Therefore, the original act governs here.

MEMORANDUM OF DECISION - 11

> disinterested managers or members, or other persons participating in
> the management of the business or affairs of the limited liability
> company, from:
> (a) Any transaction connected with the conduct or winding up of the
> limited liability company; or
> (b) Any use by the member or manager of its property, including, but
> not limited to, confidential or proprietary information of the limited
> liability company or other matters entrusted to the person as a result of
> his status as manager or member.

Idaho Code § 53-622(2) (2009) (emphasis added).

The Ninth Circuit considered language similar to that contained in Idaho

Code § 53-622(2) in *Ragsdale*, a case in which the court was tasked with

determining whether, under California law, partners acted in a fiduciary capacity

toward each other for purposes of § 523(a)(4).  780 F.2d at 795–97.  The provision

at issue there, Cal. Corp. Code § 15021 (1977), provided:

> Every partner must account *to the partnership* for any benefit, and
> *hold as trustee for it* any profits derived by him without the consent of
> the other partners from any transaction connected with the formation,
> conduct, or liquidation of the partnership or from any use by him of its
> property.

*Id.* at 796 (emphasis added).  *Ragsdale* concluded that the California code

provision did not establish the fiduciary relationship required by § 523(a)(4),

noting that the statute created a trust only when a partner derived profits without

consent of the partnership; just the sort of trust *ex maleficio* that courts, including

the United States Supreme Court, had found to be outside the purview of

§ 523(a)(4).  *Id.* (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934);

MEMORANDUM OF DECISION - 12

*Teichman*, 774 F.2d at 1399)).

However, the *Ragsdale* court went on to find that California case law had made all partners trustees over the assets of the partnership, thereby elevating the duties of partners beyond those required by the literal wording of the statute. Relying on these state court decisions, the panel held that in California partners were fiduciaries within the meaning of § 523(a)(4).  *Id.* at 796–97; *see also Lewis*, 97 F.3d at 1185–86 (concluding Arizona law rendered partners trustees for purposes of § 523(a)(4)); *Lewis v. Short (In re Short)*, 818 F.2d 693, 695 (9th Cir. 1987) (reaching the same conclusion applying Washington law).

*Ragsdale* and its progeny are instructive here.  Although those decisions preclude the Court from holding that the language of Idaho Code § 53-622(2) creates the type of express trust required by § 523(a)(4), if Idaho case law has expanded the duties of LLC members to make them trustees over LLC assets, those members may qualify as fiduciaries under § 523(a)(4).  *See Streibick v. Murrell (In re Murrell)*, 04.3 I.B.C.R. 122, 126 (Bankr. D. Idaho 2004) (turning to state case law to determine whether corporate officers and directors were fiduciaries in the absence of an express agreement or statutorily-created trust) (citing *Cantrell*, 329 F.3d at 1126–28).

The Idaho Supreme Court has only recently considered the issue of fiduciary duties between LLC members.  *See Bushi v. Sage Health Care, PLLC*,

MEMORANDUM OF DECISION - 13

203 P.3d 694, 699–700 (Idaho 2009). While finding that the Act did not expressly list any such duties, the court in *Bushi* concluded that LLC members did owe one another the fiduciary duties of trust and loyalty. *Id.* at 699. However, *Bushi* did not go so far as to deem LLC members to be trustees over LLC assets. Absent such a pronouncement, this Court declines to find Idaho LLC members are fiduciaries within the narrow meaning of § 523(a)(4). *See Ragsdale*, 780 F.2d at 796 ("The broad, general definition of fiduciary — a relationship involving confidence, trust and good faith — is inapplicable in the dischargeability context."); *Honkanen*, __ B.R. at __, 2011 WL 781831, at *3 ("The mere fact that state law puts two parties in a fiduciary-like relationship does not necessarily mean it is a fiduciary relationship within 11 U.S.C. § 523(a)(4)."). Accordingly, the Court concludes that Recyclers, Debtors' closely-held entity, was not acting in a fiduciary capacity with respect to Murray, its fellow LLC member.[9]

### b. Debtors were not acting in a fiduciary capacity with respect to Boise Island

Boise Island claims that Debtors were acting in a fiduciary capacity when they collected rent receipts on its behalf and did not remit them as required under the property management Agreement. The Court disagrees.

---

[9] Because the Court finds that the requisite fiduciary relationship did not exist between Recyclers and Murray, it need not, and does not, take the additional step of determining whether any fiduciary obligations of Recyclers extended to Debtors personally on a veil piercing theory or otherwise.

MEMORANDUM OF DECISION - 14

The relationship between Boise Island and Debtors' property management company was one of principal and agent. The Agreement refers to Lawrence & Associates as an "agent" of Boise Island. It grants Lawrence & Associates express authority to, on behalf of Boise Island, execute leases and rental agreements, collect rent and other receipts, and pay bills associated with the Riviera Estates property. As property manager Lawrence & Associates owed duties, both contractual and fiduciary, to Boise Island. *See Jordan v. Hinter*, 865 P.2d 990 (Idaho App. 1993) (agent owes principal fiduciary duties of good faith and fair dealing). This included the obligation to remit net monthly rent receipts to Boise Island. However, this agency relationship did not give rise to a trust under Idaho law. *See DBSI/TRI V v. Bender*, 948 P.2d 151, 163–64 (Idaho 1997) (finding that arrangement that granted property management company exclusive management over owner's property did not turn an agency relationship into a trust); *see also Honkanen*, __ B.R. at __, 2011 WL 781831, at *3 n.7 (noting that under California law debts due by a bankruptcy debtor in the character as an agent, among others, did not give rise to a technical trust).

Because the relationship between Debtors' property management company, Lawrence & Associates, and Boise Island was an agency, and because such a relationship does not impose the type of trust required under § 523(a)(4), the Court

MEMORANDUM OF DECISION - 15

concludes that Debtors were not acting in a fiduciary capacity.[10]

### 3.    Embezzlement

Although the Court finds that Debtors were not acting in a fiduciary capacity, its inquiry under § 523(a)(4) is not complete.  Embezzlement under § 523(a)(4) does not require the existence of a fiduciary relationship. *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991).

In the nondischargeability context, embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come."  *Id.*  Thus, three elements are required to show embezzlement: "(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which it was entrusted; and (3) circumstances indicating fraud."  *Id.*; *First Del. Life Ins. Co. v. Wada (In re Wada)*, 210 B.R. 572, 576 (9th Cir. BAP 1997).

### a.    Murray

Murray has proven the elements of embezzlement in this case.  Debtors were rightfully in possession of the Tubac account funds.  They had signature authority on the account and were authorized by Murray to use the $42,600 to

---

[10]  As with Murray, *see* note 9 *supra*, because the Court finds that the requisite fiduciary relationship did not exist between Boise Island and Lawrence & Associates it need not determine whether any fiduciary obligations of Lawrence & Associates extended to Debtors personally.

MEMORANDUM OF DECISION - 16

purchase the Tubac property. When Debtors used the funds, with the exception of
the $5,000 down payment, to pay themselves "compensation" for their services
and to make short-term "loans" to their other business entities, through Lawrence
& Associates, Debtors appropriated that money for a use other than that for which
it was entrusted.

Despite Debtors' argument to the contrary, the payments made from the
Tubac account were not allowed by the Tubac operating agreement. Per the
agreement, payment of compensation to managing members and the disposition of
LLC assets, including the commingling of LLC funds with those of another entity,
required the agreement of a majority of the members, *see* Ex. 130 §§ 4.18.1, 4.15
& 4.16,[11] with "majority" meaning "a number more than one half the total
Members." *Id.* § 1.20. Tubac consisted of two members — Recyclers and
Murray. Thus both members were needed to constitute a majority.[12] However,
Murray was never informed of, and thus did not agree to, the purported
compensation or the loans to Debtors' other closely-held entities. Indeed, when
attempts to acquire the Tubac property failed and Debtors approached Murray
about possibly loaning money to their other businesses — all this after Debtors

---

[11] Although neither of the operating agreements admitted at the trial, Exs. 129 and 130,
was fully executed, both Murray and Woodman testified that those documents accurately
reflected the operating agreement the parties ultimately entered into. The Court chooses to
refer to Ex. 130 as Ex. 129 appears to be missing a page.

[12] Debtors' implied argument that "majority" meant a majority of the ownership interests
was thus belied by the terms of the Tubac operating agreement.

MEMORANDUM OF DECISION - 17

had already transferred the funds out of the Tubac account — Murray rejected

their proposal.  Under these circumstances, the Court finds that Murray has shown

adequate evidence of fraud.

Based on these reasons, the Court concludes that Murray has a

nondischargeable claim against Debtors for $37,600 — Murray's $42,600

investment less the $5,000 that was used as a down payment on the Tubac

property — under § 523(a)(4), stemming from Debtors' embezzlement of the

Tubac funds.  Debtors are personally liable, jointly and severally, on this debt as

both played active roles in transferring the funds.  *See L.B. Indus., Inc. v. Smith*,

817 F.2d 69, 71 (9th Cir. 1987) (corporate directors and officers may be held

personally liable if they specifically direct, actively participate in, or knowingly

acquiesce in the fraud or other tortious wrongdoing of the corporation or its

officers); *Bell*, 232 B.R. at 465; *Nelson v. Post Falls Mazda (In re Nelson)*, 159

B.R. 924, 925–26 (Bankr. D. Idaho 1993); *In re Hawkins*, 144 B.R. 481, 484–85

(Bankr. D. Idaho 1992).

### b.    Boise Island

Boise Island contends Debtors embezzled the July and August rents and

security deposits collected by Lawrence & Associates.  Debtors argue that

ownership of the rent receipts was conferred to Lawrence & Associates when it

collected those funds.  Therefore, they contend, Debtors did not commit

embezzlement because those funds were not owned by Boise Island at the time

MEMORANDUM OF DECISION - 18

Debtors transferred them into Lawrence & Associates' general account.  They

further assert that because the Agreement imposed no duty to segregate the funds

Lawrence & Associates merely had a contractual obligation to pay Boise Island a

sum equal to the net after deducting its management fee and any expenses for

maintaining the property.  The Court is not convinced.

First, proving embezzlement does not always require a pre-existing

obligation to keep the funds in a separate account.  *See Wada*, 210 B.R. at 576.

Second, the evidence belies Debtors' argument.  The Agreement, Ex. No. 105,

referred to Lawrence & Associates as the "agent" of Boise Island and authorized it

to act on Boise Island's behalf.  Further, Lawrence testified that she understood

the collected rents and deposits to be property of Boise Island, not Lawrence &

Associates.  Although Lawrence & Associates deducted a 5% fee from those

receipts for its services, the remainder of the funds were property of Boise Island,

held by Lawrence & Associates as its agent.

As agents of Lawrence & Associates' managing member, Debtors had

rightful possession of the rent and deposit receipts, which belonged to Boise Island

(with the exception of the 5% allocated to Lawrence & Associates' management

fee).  The evidence established that Debtors transferred the Boise Island funds into

Lawrence & Associates' general operating account, from which Debtors paid

expenses for their businesses and also drew their salaries, through Revolution 1.5.

By using Boise Island's funds in this manner rather than forwarding those funds to

MEMORANDUM OF DECISION - 19

Boise Island, Debtors appropriated that money for a use other than that for which it was entrusted.[13]

Debtors also contend they lacked the fraudulent intent required to find embezzlement because they did not intend to permanently deprive Boise Island of its rent receipts, but instead intended to pay them at some later point when they had the funds to do so.

This Court considered a similar argument in *Applegate v. Shuler (In re Shuler)*, 21 B.R. 643, 644 (Bankr. D. Idaho 1982). There, the debtor sold a trailer on consignment and retained the sale proceeds in his general business account instead of paying them over to the creditor-consignor. The debtor argued he lacked the requisite fraudulent intent because he did not intend to permanently deprive the creditor of the money that was rightfully his. The Court nonetheless inferred an intent to deprive, reasoning that the debtor had an "affirmative duty" to

---

[13]   Though Debtors suggest some of the expenses paid with Boise Island's funds could have inured to the benefit of Boise Island, they acknowledged through their testimony that a significant portion of the those funds were used to pay expenses other than those related to the Riviera Estates mobile home park. Once Boise Island established that the funds had been commingled and used, to a large degree, for unauthorized purposes, the burden of going forward with evidence shifted to Debtors to identify the specific expenditures deducted from the July and August rents, if any, that were related to the Riviera Estates property. *See, e.g.*, *Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1461–62 (9th Cir. 1997) (explaining burden imposed on an agent under common law principles of agency: "If the principal proves or the agent admits that the agent has come into possession of money or other thing for the principal, the agent has the burden of proving that he has paid it to the principal or disposed of it in accordance with his authority.") (quoting Restatement (Second) of Agency § 382). Debtors failed to make such a showing. Therefore the Court will treat the entire amount of the rents and security deposits collected, minus the 5% representing Lawrence & Associates' management fee, as having been used for a purpose other than that for which it was entrusted.

MEMORANDUM OF DECISION - 20

pay the creditor his share of the proceeds from the sale and the debtor's failure to do so was not caused by circumstances or conditions beyond his control. It further concluded that an intent to deprive the rightful owner of funds only temporarily and not permanently did not negate the element of intent. *Id.*

Similar to the debtor in *Shuler*, Debtors here were required to remit to Boise Island the net rents they collected and held on Boise Island's behalf. Instead of doing so, Debtors chose to use those funds to pay expenses for their other businesses, including compensation to themselves through their LLC Revolution 1.5. Any intent to restore those funds to Boise Island at a later date does not negate the initial intent to deprive Boise Island of its rent receipts with which Debtors had been entrusted. *See Shuler*, 21 B.R. at 644; *see King v. Lough (In re Lough)*, 422 B.R. 727, 735 (Bankr. D. Idaho 2010).

Under these circumstances, the Court finds that Boise Island has a nondischargeable claim against Debtors under § 523(a)(4) of $36,123.75 — the total gross rents and deposits collected for the Riviera Estates property for July and August, 2008 ($38,025), less Lawrence & Associates' 5% management fee ($1,901.25). Although Debtors may have been acting as agents of their closely-held LLCs in carrying out the property management duties of Lawrence & Associates, they are nonetheless personally liable for the embezzlement in which they actively participated and knowingly acquiesced. *See L.B. Indus.*, 817 F.2d at

MEMORANDUM OF DECISION - 21

71; *Bell*, 232 B.R. at 465.[14]

### C.   Attorney's Fees

Plaintiffs did not request attorney's fees in their respective complaints. However, during their rebuttal at closing argument, Plaintiffs made a general request for an award for attorney's fees incurred in prosecuting these actions.

To recover attorney's fees incurred in pursuing a nondischargeability action a creditor must be able to recover the fees outside the bankruptcy court under state or federal law. *See Kilborn v. Haun (In re Haun)*, 396 B.R. 522, 526–27 (Bankr. D. Idaho 2008) (quoting *Levitt v. Cook (In re Levitt)*, BAP No. AZ-07-1166 (9th Cir. BAP July 22, 2008)). There is no general right to recover attorney's fees under the Bankruptcy Code, *see id.* at 526, and Plaintiffs have not identified any other federal law under which they are entitled to fees. Nor did Plaintiffs identify in their request what state law entitled them to fees. In Idaho, a party claiming attorney's fees must assert the specific statute, rule or case authority supporting its claim. *Id.* at 528 (citing *Hopkins v. Saratoga Holdings, LLC (In re Colvin)*, 08.2 I.B.C.R. 63, 65, 2006 WL 1657855, at *4 (Bankr. D. Idaho May 2, 2008)). Indeed, Plaintiffs did not assert any authority whatsoever to support their request. Therefore, the request for fees is denied. Costs under Rule 7054(b) and LBR

---

[14]   Plaintiffs also cited § 523(a)(6) as a basis for excepting their claims from Debtors' discharge. Given the Court's findings and conclusions regarding Plaintiffs' causes of action under § 523(a)(4), the Court finds additional analysis under § 523(a)(6) unnecessary.

MEMORANDUM OF DECISION - 22

7054.1, but no fees, will be allowed.

**CONCLUSION**

Based on the foregoing, and pursuant to § 523(a)(4), the Murrays' claim of

$37,600 and Boise Island's claim of $36,123.75 will be excepted from Debtors'

discharge.  The remainder of Plaintiffs' causes of action will be dismissed.

Plaintiffs will be awarded costs.

Counsel for Plaintiffs shall submit a proposed form of judgment in accord

herewith.

DATED: March 22, 2011

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 23